D. LINWOOD STONE AND J. A. STONE v. MARVIN McCLAM, C. E. SMITH, NORMAN SANDERS, WILLIAM R. HOCUTT, AND FCX, INC.

No. 7810SC590

(Filed 31 July 1979)

**Fraud § 7; Fiduciaries § 2; Corporations § 13— transfer of stock—no fiduciary relationship**

In an action to recover damages for fraud by defendants FCX and officers and employees of FCX in inducing plaintiffs to transfer their stock in a turkey raising and processing business to FCX in return for FCX's release of plaintiffs from personal liability on account of their guaranties of payment of the indebtedness of the turkey business to FCX, the evidence was insufficient to support a jury finding that any fiduciary relationship existed between the parties such as to cast on defendants the burden of proving that they acted in good faith in the stock transfer transaction where: (1) the debtor-creditor relationship between plaintiffs and FCX did not in itself create any fiduciary relationship between the parties, and (2) although the individual defendants, all of whom were acting in behalf of FCX, had also become the officers and directors of the turkey business, plaintiffs actively managed the turkey business until a short time prior to the stock transfer and had equal or better access than defendants to all information pertinent to determining the fair value of their stock, and there was no evidence of special circumstances which would place defendants in a fiduciary relationship toward plaintiffs in connection with the transfer of their stock.

APPEALS by plaintiffs and defendants from *Clark, Judge.* Judgment entered 3 February 1978 in Superior Court, WAKE County. Heard in the Court of Appeals 27 March 1979.

This is a civil action in which plaintiffs seek to recover damages from defendants based on allegations that defendants, by actual fraud and by constructive fraud in breaching a fiduciary relationship which plaintiffs allege existed between plaintiffs and defendants, wrongfully induced plaintiffs to execute on 5 March 1975 a certain Agreement and Release by which plaintiffs quitclaimed to the defendant, FCX, Inc. (hereinafter referred to as "FCX"), all of plaintiffs' stock in Stone Bros., Inc. (hereinafter referred to as "Stone Bros."). The individual defendants are officers or employees of FCX. In their complaint plaintiffs alleged that the fair market value of their stock obtained by defendants through fraud was at least $3,712,000.00, and they prayed for recovery of actual damages in that amount plus interest from 5 March 1975, treble damages pursuant to G.S. Ch. 75, and punitive

damages. Defendants answered and denied the allegations of fraud and wrongdoing on their part, and by way of counterclaim FCX sought recovery from plaintiff D. Linwood Stone of $12,892.56 and from plaintiff J. A. Stone $25,011.52 which defendants allege was owed by these parties respectively to Stone Bros. and which indebtednesses had been transferred to FCX.

Allegations and admissions in the pleadings, stipulations of the parties, and evidence offered at the trial show the following: On and prior to 5 March 1975 plaintiffs were the owners in equal shares of all of the stock of Stone Bros., a North Carolina corporation which for some twenty years had been engaged in an integrated turkey raising and processing business. In connection with this business, Stone Bros. owned assets consisting of land, buildings, equipment, supplies, and other tangible property, and in addition owned 25% of the common stock in Raeford Turkey Farms, Inc. (hereinafter referred to as "Raeford"), a North Carolina corporation engaged in processing and selling turkeys. Raeford had been started in 1962, and Stone Bros. acquired its 25% stock interest in Raeford at that time for an investment of $30,000.00. During the years prior to 1974 the businesses of both Stone Bros. and Raeford prospered and grew.

The defendant, FCX, is engaged in the business, among other matters, of selling feed and farm supplies to poultry producers. Over the years it furnished to Stone Bros. large amounts of feed, nutrients, and other supplies necessary for its turkey raising business, taking as security for the account so created mortgages, deeds of trust, and other security agreements creating liens on virtually all of the assets of Stone Bros. In addition, on 4 March 1969 the individual plaintiffs guaranteed payment by Stone Bros. to FCX of a certain demand note in the sum of $320,353.63 and a bond in the sum of $400,000.00, both of which were executed by Stone Bros. to FCX on that date, and secured their guaranties by executing a Stock Pledge Agreement dated 4 March 1969 by which they transferred all of their stock in Stone Bros. to William H. McCullough as Trustee, granting to the Trustee the power in event of default by Stone Bros. in payment of the promissory note to FCX to sell the pledged stock at public or private sale and to apply the proceeds to pay the unpaid principal and interest of the debt secured. By the Stock Pledge Agreement the plaintiffs also appointed the Trustee their attorney-in-fact for the period of

ten years to vote the pledged shares at all meetings of stockholders of Stone Bros.

By a letter agreement dated 8 April 1969, FCX agreed, among other matters, to furnish Stone Bros. money for its payroll and other current operating expenses, and as part of this agreement as FCX auditor, the defendant William R. Hocutt, went to work in the office of Stone Bros. with responsibility to supervise and check all accounting records and procedures on a daily basis. FCX charged Stone Bros. for Mr. Hocutt's services. During ensuing years FCX continued to furnish Stone Bros. feed, supplies, and operating capital. On 3 February 1972 Stone Bros., the individual plaintiffs, and FCX signed a Financing Extension Agreement in which it was recited that as of 31 January 1972 Stone Bros. was indebted to FCX in the aggregate sum of $1,346,133.57 and by which FCX agreed, subject to certain conditions, to continue to furnish supplies and operating capital to Stone Bros. until the end of its fiscal year ending 30 November 1972. By subsequent letter agreement dated 29 September 1972, this Financing Extension Agreement was extended to 30 November 1973. For its fiscal year ending 30 November 1973 Stone Bros. operated at a profit, and by letter agreement dated 29 November 1973 the Financing Extension Agreement was further extended to 30 November 1974.

In 1974 the price of turkeys dropped sharply. At the same time, the price of corn, soybeans, and other supplies needed for growing turkeys skyrocketed. As a result of these factors, Stone Bros. suffered severe losses in 1974, its Statement of Operations for the eleven months period ending 31 October 1974 showing a net operating loss of $942,591.68. During this period the indebtedness owed by Stone Bros. to FCX increased sharply so that by 31 October 1974 Stone Bros. owed FCX in excess of $3,100,000.00. On 13 November 1974 the defendant C. E. Smith, Vice-President and Treasurer of FCX, notified the plaintiff, D. Linwood Stone, President of Stone Bros., that FCX was going to have to close out the account and would not extend any financing after 30 November 1974 on any additional flocks of turkeys.

On 20 November 1974 C. E. Smith, accompanied by Norman Sanders, a divisional manager of the poultry production division of FCX, and William R. Hocutt, all representing FCX, met in

Lumberton, N.C., with the plaintiffs, D. Linwood Stone, President of Stone Bros., and his brother, J. A. Stone, who was a director and officer of Stone Bros. Also present at that meeting was William McCullough, attorney for FCX and the trustee named in the 4 March 1969 Stock Pledge Agreement. C. E. Smith, on behalf of FCX, demanded payment of the debt owed by Stone Bros. to FCX. Plaintiffs responded that they were without funds to pay the indebtedness, whereupon Smith called on McCullough to exercise the powers conferred on him by the 4 March 1969 Stock Pledge Agreement to vote all of plaintiffs' stock in Stone Bros. McCullough did so at a special meeting of stockholders of Stone Bros. which resulted in removing plaintiffs as directors and electing the defendants Smith, Sanders, and Hocutt as the new Board of Directors of Stone Bros. At a meeting of the new Board, new officers for Stone Bros. were elected, Sanders being elected President, Hocutt Vice-President and Treasurer, and Smith Secretary and Chairman of the Board. The new officers took charge of Stone Bros. and set about liquidating its assets and winding up its affairs. The plaintiff J. A. Stone was discharged as an employee and after November 1974 had no further connection with Stone Bros. except as a stockholder. The plaintiff D. Linwood Stone was asked to remain as an employee to assist in managing the turkey flocks until liquidation of Stone Bros. could be accomplished, and he did continue to serve as an employee until March 1975. Both plaintiffs remained stockholders of Stone Bros. until 5 March 1975, when the transaction which gave rise to this litigation occurred.

During the period after 20 November 1974 and continuing through February 1975 the plaintiff, D. Linwood Stone, actively undertook to obtain a loan from the Farm Home Administration for the purpose of settling in cash the account of Stone Bros. with FCX. During this period he also participated in discussions between a Mr. Hervey Evans, who was acting for Raeford, and Smith, who was acting for FCX, concerning a possible acquisition by Raeford of the assets of Stone Bros. or of FCX's interests in Stone Bros. During these discussions the officials of FCX stated that there would be a substantial loss to FCX on the Stone Bros. account, and they indicated that FCX would be willing to accept a settlement of the account for substantially less than its full

amount. All negotiations for a loan or sale of Stone Bros. on a basis which would permit it to continue in business failed.

Although plaintiffs had been removed as directors of Stone Bros. on 20 November 1974, they remained as members of the Board of Directors of Raeford, and on 25 February 1975 the plaintiff D. Linwood Stone attended a meeting of that Board. He also attended a meeting held immediately prior to the official meeting of the Board of Directors of Raeford at which there were present Mr. David B. Brooker, a Vice-President of the Columbia Bank for Cooperatives, and the defendant Smith, who was representing FCX. At that meeting a general discussion was held concerning the possibility of converting Raeford into a cooperative, and Brooker explained some of the mechanics of effecting such a conversion and the basis on which the Columbia Bank might be willing to extend loans should a cooperative be formed to take over the assets and business of Raeford. During this discussion a figure of six or seven million dollars was mentioned as the possible basis on which the assets of Raeford could be transferred to a cooperative.

On 5 March 1975 the defendants Smith, Sanders, and Hocutt met in the office of Stone Bros. in Lumberton, N. C. with the plaintiff, D. Linwood Stone, and presented to him a written Agreement and Release, dated and executed by FCX on 4 March 1975, in which it was recited that it appeared likely that Stone Bros.'s indebtedness to FCX would far exceed the value of Stone Bros.'s assets and that a substantial deficiency would exist, and by which FCX released the plaintiffs from all personal liability on account of their guaranties of 4 March 1969 and any other guaranty made by them of payment of Stone Bros.'s indebtedness to FCX, and by which the plaintiffs in turn released and quitclaimed to FCX all rights in their stock in Stone Bros. Smith told D. Linwood Stone to take this document to an attorney and let him look at it to see if it didn't release the plaintiffs. Stone took the document to the office of attorney Ellis Page, who examined it and advised Stone that the document did release the plaintiffs. After receiving this advice, both plaintiffs signed the document and returned an executed copy to Smith for FCX. After this transaction, the plaintiffs had no further interest as stockholders in Stone Bros. Shortly after 5 March 1975 the plaintiffs resigned as directors of Raeford.

Following the 5 March 1975 transaction by which plaintiffs released and quitclaimed to FCX all of their stock in Stone Bros., the individual defendants continued their efforts to liquidate the assets of Stone Bros. Included among these assets was the 25% stock interest in the capital stock of Raeford, which was still carried on the books of Stone Bros. at its acquisition cost of $30,000.00. In attempting to liquidate the 25% stock interest in Raeford, the defendants worked with the other stockholders in Raeford to accomplish a transfer of all of Raeford's business and assets to a newly formed cooperative, which was at first called Five TP Cooperative, Incorporated, but later named the House of Raeford Farms, Incorporated (hereinafter referred to as "House of Raeford"). Such a cooperative would have access to financing by the Columbia Bank for Cooperatives. These efforts were ultimately successful, the date of the agreement of sale being 31 May 1975 and the sale being actually closed on 1 August 1975. The sales price was slightly in excess of $8,600,000.00, Stone Bros.'s 25% interest in the sales proceeds being $2,159,919.00. Of this amount, however, Stone Bros. received only $250,000.00 in cash, the balance being represented by a note of House of Raeford for $1,522,419.00 and a revolving fund certificate for $387,500.00. After the closing of the sale of Stone Bros.'s 25% interest in Raeford to the House of Raeford cooperative, a balance sheet of Stone Bros. prepared as of 31 August 1975 showed a net worth of $394,312.00.

Other evidence will be referred to in the opinion.

Issues were submitted to and answered by the jury as follows:

1. Did the defendants procure the execution of the Agreement and Release of March 5, 1975 by means of false and fraudulent representations?

ANSWER: No

2. Did a fiduciary relationship between plaintiffs and defendants exist with respect to the transaction between them of March 5, 1975?

ANSWER: Yes

3. If so, did the defendants exercise good faith and refrain from obtaining any advantage to themselves at the expense of the plaintiffs in connection with said transaction?

ANSWER: No

4. What amount of actual damages are plaintiffs entitled to recover of defendants, if any?

ANSWER: $394,312.00

5. What amount of punitive damages, if any, are plaintiffs entitled to recover of:

(a) Defendant, FCX, Inc.?

ANSWER: $368,312.00

(b) Defendant, C. E. Smith?

ANSWER: $0

(c) Defendant Marvin McClam?

ANSWER: $0

(d) Defendant William R. Hocutt?

ANSWER: $0

(e) Defendant Norman Sanders?

ANSWER: $0

6. What amount, if any, are the Plaintiffs indebted to the defendant, FCX, on its counterclaim?

(a) Linwood Stone

ANSWER: $0˙

(b) J. A. Stone

ANSWER: $0

From judgment that plaintiffs recover $394,312.00 from all of the defendants and that it recover from the defendant FCX the additional sum of $368,312.00, both plaintiffs and defendants appeal.

*Boyce, Mitchell, Burns & Smith by Eugene Boyce, Robert E. Smith, Lacy M. Presnell III, and James M. Day for plaintiffs, appellants and appellees.*

*Sanford, Cannon, Adams and McCullough by J. Allen Adams, William H. McCullough, Charles C. Meeker and Nancy Bentson Essex for defendants, appellants and appellees.*

PARKER, Judge.

### DEFENDANTS' APPEAL

By its answer to the first issue, the jury has established that defendants did not procure the execution of the 5 March 1975 Agreement and Release by any fraudulent representation. Thus, no issue as to actual fraud remains in this case, and the essential question presented by defendants' appeal is whether the evidence was sufficient to warrant submission of the second issue to the jury. We find the evidence insufficient to support a jury finding that any fiduciary relationship existed between the parties with respect to the 5 March 1975 transaction such as to cast the burden on defendants of proving that they acted in good faith therein. Accordingly, we sustain defendants' assignments of error directed to the denial of their motions for a directed verdict on the second issue, and we reverse the judgment granting plaintiffs recovery of actual and punitive damages.

It is, of course, true that "[w]here a transferee of property stands in a confidential or fiduciary relationship to the transferor, it is the duty of the transferee to exercise the utmost good faith in the transaction and to disclose to the transferor all material facts relating thereto and his failure to do so constitutes fraud." *Link v. Link*, 278 N.C. 181, 192, 179 S.E. 2d 697, 704 (1971). In such a case the burden is on the transferee to show that he acted fairly and in good faith. *McNeill v. McNeill*, 223 N.C. 178, 25 S.E. 2d 615 (1943); *Smith v. Moore*, 149 N.C. 185, 62 S.E. 892 (1908). Before that burden may properly be placed upon the transferee, however, there must first be a finding, supported by adequate evidence, that a confidential or fiduciary relationship existed between the parties with respect to the transaction which is brought into question. It is for failure of the evidence on this issue that we reverse the judgment for plaintiffs in the present case.

At one time our Supreme Court was careful to limit the constructive fraud doctrine, with its shift to the defendant of the burden of proving fairness and good faith, to "only 'the known and definite fiduciary relations,' by which one person is put in the power of another." *Lee v. Pearce*, 68 N.C. 76, 87 (1873). By way of illustration, but being careful to point out that there may be other instances, the court in that case listed the following: (1) Trustee and cestui que trust dealing in reference to the trust fund; (2) Attorney and client, in respect to the matter wherein the relationship exists; (3) Guardian and ward, just after the ward arrives at age; and (4) A general agent and his principal where the agent has the entire management of the principal's affairs. In a much more recent case our court stated that "[t]he relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one resposing confidence." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). Even when we apply this much broader concept, we find the evidence in the present case insufficient to support a finding that a fiduciary relationship existed between the defendants and the plaintiffs with respect to the 5 March 1975 transaction.

Examining the evidence as it relates to the relationship which existed between the parties on 5 March 1975, the first and most obvious aspect of the relationship shown is that plaintiffs were on that date, contingently at least, indebted to FCX on their guaranties of the obligations of Stone Bros. and that plaintiffs' contingent liability was secured by a pledge of their stock in Stone Bros. to McCullough as trustee under the 4 March 1969 Stock Pledge Agreement. It is settled, however, that "[t]here is no fiduciary relation between a creditor and his debtor, by which it can be said that the latter is in the power of the former. . . . Nor does the fact that the debtor has conveyed property to a third person to secure his creditor establish any fiduciary relation between him and such creditor." *Simpson v. Fry*, 194 N.C. 623, 627, 140 S.E. 295, 297 (1927); *accord, Curry v. Andrews*, 230 N.C. 531, 53 S.E. 2d 542 (1949). Thus, the debtor-creditor relationship between plaintiffs and FCX did not in itself create any fiduciary relationship between plaintiffs and defendants in this action.

The other obvious aspect of the relationship which existed between the parties on 5 March 1975 is that the defendants Smith, Sanders, and Hocutt (all of whom were admittedly acting on behalf of FCX) were the officers and directors of Stone Bros. in which plaintiffs were the stockholders. There can be no question that officers and directors of a corporation stand in a fiduciary relation to the corporation and its shareholders with respect to the management of the business and assets of the corporation. G.S. 55-35. It should be noted, however, that in this case no contention is made, nor was the slightest shred of evidence introduced which suggests, that any of the defendants did anything wrong in connection with the management of the business of Stone Bros. or in connection with the disposition of its assets. Indeed, it is precisely because the defendants may ultimately have succeeded in making a favorable disposition of a portion of those assets, being Stone Bros.'s 25% stock interest in Raeford, that this litigation came into being. The question presented by this appeal thus becomes narrowed to whether, under the circumstances of this case, the defendants Smith, Sanders, and Hocutt, as officers and directors of Stone Bros., occupied a fiduciary relationship toward plaintiffs with respect to the acquisition from plaintiffs of their stock in Stone Bros. in the 5 March 1975 transaction.

This Court, in *Lazenby v. Godwin*, 40 N.C. App. 487, 253 S.E. 2d 489 (1979), has recently had occasion to examine the principles of law applicable to determining whether a director of a corporation stands in a fiduciary relationship to a shareholder with respect to the acquisition of the shareholder's stock. In a scholarly opinion by Clark, Judge, in which the pertinent authorities are discussed and analyzed, this Court adopted the view that, under special circumstances, a director of a corporation may stand in a fiduciary relation to a shareholder in the acquisition of the shareholder's stock. In that case the Court found sufficient evidence of such special circumstances, in this connection stressing the evidence showing that the defendant in that case had managed the corporation since its inception in 1950, that although plaintiffs were technically codirectors there had been no regular directors meetings, that plaintiffs did not take part in the management of the corporation but placed their trust in the business skill and judgment of the defendant, and that plaintiffs did not have equal access with the defendant to the information

needed to make a fair appraisal of the value of their shares. No such evidence has been presented in the present case. On the contrary, all of the evidence in the present case shows that plaintiffs had actively managed the corporation since its inception, that they continued in such active management in the capacity as officers and directors until less than four months prior to 5 March 1975, and that on that date the plaintiff D. Linwood Stone was still actively engaged on a daily basis as an employee. Thus, plaintiffs were intimately familiar with all of the assets and business of their corporation. As to the particular asset which it appears may ultimately have the most value, the 25% stock interest in Raeford, plaintiffs were in an especially favorable position to have full access to all information relevant to its value. Not only had they been connected with Raeford since its founding, but they were still on its board of directors on 5 March 1975, and the plaintiff D. Linwood Stone had attended the most recent meeting of that board held on 25 February 1975 when the possibility of selling all assets of Raeford to a cooperative was discussed. Plaintiffs here, unlike the plaintiffs in *Lazenby*, had equal or better access than did defendants to all information pertinent to determining the fair value of their shares. In this case we find no evidence of such special circumstances which would give rise to placing defendants in a fiduciary relationship toward plaintiffs in connection with the transfer of their stock in Stone Bros. on 5 March 1975.

In passing, we note that defendant FCX may not actually realize any profit, but may ultimately experience a loss, as result of its dealings with plaintiffs and with their corporation. While on paper the sale of the 25% interest in Raeford would appear most favorable, the biggest part of the purchase price was not paid in cash but by a note subordinated to other obligations and by a revolving fund certificate. Neither of these can be paid in cash unless the purchaser, House of Raeford, has many years of profitable operations. The evidence in this case shows that at the time of trial this had not occurred.

In defendants' appeal, they also assign error to the court's refusal to grant FCX's motion for a directed verdict on its counterclaims against the plaintiffs. As to this, suffice it to say that on the issues raised by the counterclaims, as to which FCX bore the burden of proof, we find no such admissions by the plaintiffs of all essential facts as would warrant directing verdict

against them. We find no error in the court's ruling in this regard.

## PLAINTIFFS' APPEAL

In their appeal plaintiffs contend that the court erred in failing to enter judgment for treble the amount of damages awarded by the jury, for attorney fees, and for payment of interest from 5 March 1975 on the amount of actual damages awarded by the jury. Since all questions thus sought to be raised are based on the assumption that the jury's award of actual damages was correct, an assumption which in view of our holding on defendants' appeal is not well founded, we find it unnecessary to discuss the questions presented by plaintiffs' appeal.

The judgment appealed from is

Reversed.

Judges HEDRICK and CARLTON concur.